STATE OF NORTH CAROLINA v. NATIVIDAD PENA CORONEL

———

STATE OF NORTH CAROLINA v. JOSE RAFAEL PENA TOMAYO

No. COA00-503
No. COA00-504

(Filed 7 August 2001)

## 1. Bail and Pretrial Release— remittance of forfeited bond— death of defendant after trial date—extraordinary circumstances—factors—diligent pursuit

The trial court did not abuse its discretion by concluding that the death of two defendants who had fled to Mexico from drug trafficking charges did not constitute sufficient extraordinary cause to warrant remittance of a bail bond judgment. The purpose inherent in the statutory scheme governing remittance suggests that it would be unfair to sureties to deny remittance when they diligently pursue defendants who die through no fault of the surety, even where the defendants die after the execution of judgment of forfeiture. However, extraordinary cause does not exist based solely on the defendant's death; the fact of the defendant's death must be weighed against certain other factors, including the inconvenience and cost to the State and the courts; the diligence of the surety in staying abreast of the defendant's whereabouts prior to the date of appearance and in searching for the defendant prior to his death; the surety's diligence in obtaining information of the defendant's death; the risk assumed by the sureties; the surety's status as private or professional; and the

STATE v. CORONEL

[145 N.C. App. 237 (2001)]

timing of defendant's death. Extraordinary cause did not exist in this case because the sureties' pursuit was not diligent.

**2. Trials— bail bond remittance—action without jury—finding supported by evidence**

Competent evidence supported the finding of a trial court, sitting without a jury to consider remittance of a bail bond forfeiture, that the sureties made no efforts to locate the defendant prior to a specific date. Although the sureties contend that there was evidence to support a contrary finding, the credibility of the evidence is weighed by the trial court rather than the appellate court.

**3. Judgments— date of entry—filing with clerk**

The trial court incorrectly found that a judgment of forfeiture of a bail bond was entered on 8 April rather than on 20 April, which affects the interest owed, where the order was signed on 8 April but filed on 20 April. An order is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court.

Appeal by sureties from orders entered 1 November 1999 by Judge Michael E. Beale in Superior Court, Richmond County. Heard in the Court of Appeals 28 March 2001.

*Parker, Poe, Adams & Bernstein, L.L.P., by Jack Cozort, for Connecticut Indemnity Company and Black Jack Bail Bonds, sureties-appellants.*

*George E. Crump, III, for Richmond County Board of Education, judgment creditor-appellee.*

TIMMONS-GOODSON, Judge.

Connecticut Indemnity Company ("Connecticut") and Black Jack Bail Bonds ("Black Jack") (collectively "sureties") appeal the Superior Court's orders denying their motions to remit judgment of bond forfeiture. The Richmond County Board of Education ("the Board") are judgment creditors and appellees in the present action by virtue of its opportunity to be heard pursuant to section 15A-544 of our General Statutes. *See* N.C. Gen. Stat. § 15A-544 (1999) (repealed Jan. 1, 2001). Upon review of the materials submitted on appeal and arguments of counsel, we affirm the orders of the Superior Court but remand for the limited purpose herein stated.

STATE v. CORONEL

[145 N.C. App. 237 (2001)]

The pertinent factual and procedural background is as follows: On 21 September 1998, the Richmond County Grand Jury indicted Jose Rafael Pena Tomayo ("Tomayo") and Natividad Pena Coronel ("Coronel") (collectively "defendants") for "trafficking in marijuana by manufacturing." In October 1998, defendants posted bond in the amount of $200,000.00, for which Black Jack and Connecticut acted as the sureties.

In paperwork submitted to Connecticut, defendants both noted they were of Hispanic descent, their parents resided in Mexico, they resided in North Carolina, and they worked for a farming operation. Coronel further related that he resided with his wife, that he had two children, one twenty-six years of age and one thirteen months old, and that he had resided in the United States for eighteen years. Notably, Tomayo wrote that he resided with his aunt and uncle, Coronel and his wife, and had only been a resident of the United States for one year and five months.

On 14 December 1998, defendants failed to appear at the criminal session of Superior Court, Richmond County. Sureties did not attend the 14 December court session. The Superior Court entered orders of bond forfeiture against defendants and gave notice to the sureties of those orders on 22 December 1998.

In orders entered 20 April 1999, the trial court filed two "Judgment[s] of Forfeiture" against defendants and sureties, each in the amount of $200,000.00. On 20 October 1999, sureties filed motions to remit the forfeited bond, stating that "extraordinary circumstances exist[ed]" for the court to set aside its judgment, in that "defendants [were] deceased and unable to be surrendered."

At a hearing based on sureties' motion, Sean Regan ("Regan"), office manager and supervising agent for Black Jack, testified that in an effort to retrieve defendants, his company "sponsored two trips to Mexico by [Agent] Brian Moody where the defendants were originally located in Guadalajara[.]" Regan further testified that while in Mexico, Agent Moody received death threats due to defendants' connections to the local drug cartel and was forced to retreat. According to Regan, Black Jack tried to arrange for legal extradition of defendants, but at some point, turned the matter over to its insurance company, who also tried to have defendants extradited. Regan admitted that his company had no independent means to monitor whether defendants appear in court.

Frederick Yerger ("Yerger"), a recovery agent supervisor for Capital Bonding Company ("Capital") (the organization who underwrote the bonds for Connecticut), testified concerning Capital's efforts to recover defendants. Yerger's testimony revealed that upon receiving notice that defendants failed to appear, he "r[a]n a computer check . . . to see if defendants show[ed] up anywhere in [the] public record" and assigned the case to recovery agent Troy Thompson ("Agent Thompson" or "Thompson"). According to Yerger, "later in April" 1999, he also assigned another recovery agent, only identified as "Collins," to manage defendants' recovery effort. "At that point," Collins confirmed that defendants had fled to Mexico.

According to Yerger, Capital sponsored two trips to Mexico, in which recovery agents attempted to legally extradite defendants to North Carolina. Agent Thompson submitted an expense report from his Mexican "trips" ("Thompson's expense report"), indicating that his expenses began on 4 July 1999, ended on 24 August 1999, and totaled $1,903.36. This was the only evidence submitted indicating the actual expenses and time exhausted in the recovery of defendants. A check request form was also submitted at trial noting that Capital paid Thompson $7,203.31 for the recovery of Tomayo. According to Yerger, the amount of the check was in addition to Agent Thompson's expenses.

Yerger testified that on their first trip to Mexico, three agents, including Thompson, observed defendants for three days. However, because the Mexican "federales" would not cooperate with the agents and defendants were "under armed guard," the agents "backed off" to avoid an incident. Evidence at trial further revealed that on his second trip to Mexico, Agent Thompson discovered that defendants had died in an 11 August 1999 automobile accident from "[t]rauma to the cranial area." Agent Thompson filed an affidavit with the court noting the following: "[D]efendants were located during prior investigations in Guadalajara, Mexico. After returning to that area to attempt to apprehend [defendants], it was learned through the 'federales' that [defendants] were deceased . . . ."

Yerger acknowledged that he did "not supervise how the bonding company looks after [defendants in North Carolina] or tr[ies] to keep up with them." Yerger admitted that it was not unusual for "Mexicans doing farm labor to return to Mexico." Yerger further acknowledged that once a Mexican farm worker retreats to Mexico, "you can get him, but you just can't get him in the same way you

STATE v. CORONEL

[145 N.C. App. 237 (2001)]

do here." Yerger affirmed that this was "[a]bsolutely" a risk that bond companies take.

On 1 November 1999, the trial court entered an order as to each defendant, denying sureties' motions. Pertinent to the issues presented on appeal, the trial court's findings of facts are as follows:

4. Judgment of bond forfeiture . . . was entered against defendant[s] and each surety . . . on April 8, 1999[.]

. . . .

6. That the grounds stated in the sureties' motion[s] are that [defendants are] deceased and unable to be surrendered by the surety and, therefore, extraordinary circumstances exist wherein it would be fair for the Court to set aside all or part of the [judgments of bond forfeiture]."

. . . .

14. [The] valid death certificate[s] of [defendants show] that [the] date of [their] death[s] was August 11, 1999.

15. [Sureties] have introduced no evidence that [defendants were] either dead or hospitalized on December 14, 1998, the date that [defendants] called and failed [sic] in Richmond Criminal Court and the date the Order of Forfeiture was issued.

16. [Sureties] have introduced no evidence whatsoever that they made any assurance as to the attendance of [defendants] on December 14, 1998 . . . .

17. [Sureties] have introduced no evidence that [they] made any efforts to verify whether or not [defendants were] in attendance in Court on . . . December 14, 1998.

18. [Sureties] made no efforts to locate [defendants] prior to July 4, 1999, as shown by [Thompson's expense report].

Based upon these findings, the trial court concluded that "the circumstances of the defendant[s'] death[s] on August 11, 1999, does not constitute 'extraordinary cause' as a matter of law to warrant remittance of the bond judgment in whole or in part." Sureties appeal the court's 1 November 1999 orders, and the appeals have been consolidated for consideration by this Court.

Sureties argue on appeal that the trial court erred (I) in concluding that they failed to present "extraordinary cause" warranting remittance of the forfeited bond; (II) in finding as fact that their first efforts to locate defendants began in July 1999; and (III) in finding as fact that judgment of forfeiture was entered on 8 April 1999.

I.

[1] By their first argument, sureties contend that the trial court erred in concluding that the death of defendants did not constitute "extraordinary cause." Sureties argue that because death of a principal constitutes "extraordinary cause," they are entitled to remittance of the forfeited bonds when the death of their principal occurred after the execution of judgment of forfeiture. With this argument, we disagree.

Section 15A-544 of our General Statutes, now repealed,[1] governs the forfeiture of the bond in the present case. N.C. Gen. Stat. § 15A-544. Even after the entry of judgment of forfeiture, if a surety surrenders a defendant within ninety days, the trial court must remit the bond. N.C. Gen. Stat. § 15A-544(e). Section 15A-544 allows for remittance of bonds, in whole or in part, after entry of judgment of forfeiture, where the defendant is not surrendered to the court within ninety days, in two situations. Pursuant to section 15A-544(e), the trial court "may" remit judgment anytime within ninety days after entry of judgment if "justice requires." N.C. Gen. Stat. § 15A-544(e). Section 15A-544(h) states, in pertinent part: "For extraordinary cause shown, the court which has entered judgment upon a forfeiture of a bond may, after execution, remit the judgment in whole or in part and order the clerk to refund such amounts as the court considers appropriate." N.C. Gen. Stat. § 15A-544(h).

Whether a surety must show that "extraordinary cause" exists for or "justice requires" remittance of forfeiture, depends upon when the motion of remittance is filed, not when the cause entitling a surety to

---

1. Relief from final judgment of forfeiture is now governed by North Carolina General Statutes section 15A-544.8, which provides:

> (a) Relief Exclusive.—There is no relief from a final judgment of forfeiture except as provided in this section.

> (b) Reasons.—The court may grant the defendant or any surety named in the judgment relief from the judgment, for the following reasons, and none other:

> (1) The person seeking relief was not given notice . . . .

> (2) Other extraordinary circumstances exist that the court, in its discretion, determines should entitle that person to relief.

N.C. Gen. Stat. § 15A-544.8 (effective Jan. 1, 2001).

remittance occurs. For example, if the death of a principal occurs prior to the date of appearance, but the surety does not discover that death prior to execution of the judgment of forfeiture, the surety must file his remittance motion pursuant to section 15A-544(h). Likewise, if death occurs between the appearance and the entry of judgment or within ninety days thereof, but the surety does not discover the death until after execution, the surety must also file his motion pursuant to section 15A-244(h), requiring him to show "extraordinary cause," not section 15A-244(e).

Because sureties in the case *sub judice* did not move to remit the judgments of forfeiture in the case within the period allowed by section 15A-544(e), section 15A-544(h) was the authority by which sureties moved for remittance of forfeiture and is the statutory provision at issue in the present appeal.

This Court has previously held that it is within the court's discretion to remit judgment for "extraordinary cause," and we therefore review the court's decision pursuant to section 15A-544(h) for abuse of discretion. *See State v. Harkness*, 133 N.C. App. 641, 516 S.E.2d 166 (1999). "Extraordinary cause," under section 15A-544(h), is cause " 'going beyond what is usual, regular, common, or customary . . . of, relating to, or having the nature of an occurrence or risk of a kind other than what ordinary experience or prudence would foresee.' " *State v. Vikre*, 86 N.C. App. 196, 198, 356 S.E.2d 802, 804 (1987) (alteration in original) (quoting *Webster's Third New International Dictionary* (1968)). In determining whether the facts of a particular case constitute "extraordinary cause," the trial court must make " 'brief, definite, pertinent findings and conclusions.' " *State v. Moore*, 64 N.C. App. 516, 520, 307 S.E.2d 834, 836 (1983) (quoting *State v. Rakina and State v. Zofira*, 49 N.C. App. 537, 541, 272 S.E.2d 3, 5 (1980)); *see also State v. Lanier*, 93 N.C. App. 779, 379 S.E.2d 109 (1989).

There are no North Carolina appellate cases examining remittance of forfeiture pursuant to section 15A-544(h) under the circumstances presented by the instant case. Thus, the issue of whether death after the execution of judgment of forfeiture can constitute "extraordinary cause," allowing for remittance under section 15A-544(h) is one of first impression in this State. Generally, North Carolina appellate cases reviewing remittance of forfeiture pursuant to section 15A-544(h) examine circumstances concerning defendant whereabouts *on the day he was to appear in court*, which are discovered after the execution of judgment, or situations in which

defendants are captured after execution of judgment. Further-more, our review of our appellate cases yields no clear consensus as to what set of circumstances constitutes "extraordinary cause." Rather, these cases indicate that such a determination is a heavily fact-based inquiry and therefore, should be reviewed on a case by case basis. A brief review of "extraordinary cause" cases is there-fore instructive.

In *Moore*, 64 N.C. App. 516, 307 S.E.2d 834, for example, a private surety secured the bond of a long-time, rather impoverished employee. On the day the defendant was to appear in court, he had been arrested and released on a prior pending charge. The surety later moved for remittance of forfeiture. The surety claimed that he was unaware of the prior charge, and that although he could not con-firm it, he was informed that the defendant committed suicide. The surety believed that the prior charge " 'accounted for the defendant's disappearance.' " *Id.* at 518, 307 S.E.2d at 835. Evidence further revealed that the forfeiture of bond would have forced the surety into bankruptcy. There was no evidence that defendant died prior to the date he was to appear in court, only that he had been released prior to that date. Based upon these circumstances, this Court found that there existed ample evidence of "extraordinary cause." *Id.* at 519, 307 S.E.2d at 836. *Compare State v. White*, 93 N.C. App. 773, 379 S.E.2d 269 (1989) (finding that trial court did not abuse its discretion in con-cluding no "extraordinary cause" existed where defendant was arrested after date of appearance and private surety was not well-educated, but he knew defendant's whereabouts on the day he was to appear, had not expended a great amount of money in searching for defendant, and his efforts were not dramatic).

Regarding professional sureties, our appellate courts have found that where the defendant is in custody in another jurisdiction on the day he was to appear in court and this fact was not discovered until after the entry of judgment of forfeiture, "extraordinary cause" gen-erally does not exist. *Vikre*, 86 N.C. App. 196, 356 S.E.2d 802; *State v. Pelley*, 222 N.C. 684, 24 S.E.2d 635 (1943). Where sureties are aware that defendants have a connection to Mexico and they are subse-quently held in Mexican custody on the day that they are to appear in court, "extraordinary cause" does not exist, even where sureties expend considerable time and money in recovery. *Vikre*, 86 N.C. App. 196, 356 S.E.2d 802. The above-referenced decisions are based upon the risks assumed by the sureties and their custodial relationship with the defendants. *Vikre*, 86 N.C. App. at 198, 356 S.E.2d at 805 (by

initially securing the bond, "[t]he sureties become custodians of the [defendant] and are responsible for the [defendant] and . . . for the bond if the [defendant] fails to appear in court when required"). At least one of these cases, *Pelley*, indicates, in *dicta*, that death or illness of the principal *on the day he is to appear in court* can constitute an excusable defense requiring remittance of forfeiture after the ninety-day time limit has passed. *See Pelley*, 222 N.C. at 688, 24 S.E.2d at 637 (noting that relief can be sought where appearance by defendant is rendered impossible or excusable by "an act of God"); *see cf. State v. Horne*, 68 N.C. App. 480, 483, 315 S.E.2d 321, 323 (1984) (finding that motion for remittance under section 15A-544(e), not section 15A-544(h), was properly denied where "there was no evidence of personal sickness or death" on the day defendant was scheduled to appear in court).

Finally, our appellate courts have held that "extraordinary cause" exists where the professional surety actually recovered the defendant after the ninety-day deadline, although surety's search efforts were "not dramatic." *State v. Locklear*, 42 N.C. App. 486, 489, 256 S.E.2d 830, 832 (1979).

The Board argues, based upon *Pelley*, that death can constitute "extraordinary cause," only upon a showing that death occurred *on or prior to the date the defendant should have appeared in court.* We find that neither *Pelley* nor any other North Carolina case supports this assertion. Rather, as stated *supra*, *Pelley* only mentions in *dicta* that proof of death prior to the date of the defendant's appearance allows for remittance of forfeiture, but it does not limit remittance to cases where death occurs prior to the date defendant should have appeared in court.

We, in fact, agree with the Court in *Pelley*, that a defendant's death prior to the date the principal was to appear in court constitutes "extraordinary cause," even if discovered after the execution of judgment of forfeiture. It is axiomatic that under those circumstances it would be not only beyond "extraordinary," but impossible for the surety to ensure the defendant's appearance. As the United States Supreme Court long ago acknowledged: "It is the settled law . . . that the bail will be exonerated where the performance of the condition is rendered impossible by the act of God, the act of the obligee, or the act of the law." *Taylor v. Taintor*, 83 U.S. 366, 369, 21 L. Ed. 287, 289 (1873) (footnote omitted). Situations "[w]here the principal dies before the day of performance" falls within the above-noted category of cases. *Id.*; *see also People v. Parkin*, 189 N.E. 480 (N.Y. 1934) (sug-

gesting that death of defendant prior to appearance allows remittance of right).

We do not agree, however, that remittance should be allowed only where defendant's death occurs prior to or on the date of his scheduled appearance. As noted *supra*, there is no North Carolina case supporting this assertion. Neither do our appellate courts expressly exclude the possibility that "extraordinary cause" can exist where death occurs after the defendant's scheduled appearance.

Furthermore, while cases from other jurisdictions are not binding on this Court, they provide insight into how this novel issue has been previously analyzed and are therefore instructive. These cases indicate that while remittance of forfeiture based upon the defendant's death prior to the date he is to appear in court is either a matter of right or of course, remittance *may* be allowed when the defendant's death occurs after the court date, given certain circumstances. *See Parkin*, 189 N.E. 480; *People v. Midland Ins. Co.*, 411 N.Y.S.2d 521 (N.Y. Sup. Ct. 1978); *see also Western Surety Co. v. People*, 208 P.2d 1164 (Colo. 1949); *State v. Warwick*, 29 N.E. 1142 (Ind. App. Ct. 1892); *State v. Traphagen*, 45 N.J.L. 134 (N.J. 1883). These cases further indicate that essential to determining what conditions allow remittance of forfeiture is a close examination of the statutory provisions governing remittance. *See e.g.*, *Warwick*, 29 N.E. 1142 (noting that the right to obtain discharge from forfeiture is statutory); *People v. Caro*, 753 P.2d 196 (Colo. 1988) (indicating a strict adherence to the statutory language in that where statute did not allow for forfeiture to be set aside, sureties' only option was a motion per Rule 60). Accordingly, to determine whether remittance of forfeiture is allowed in this State where death occurs after the date of appearance and, as in the present case, even after execution of judgment, we now examine section 15A-544(h).

In construing the meaning of a statute, this Court must effectuate the intent of the legislature, which is revealed in "the language of the statute, the spirit of the statute, and what it seeks to accomplish." *State ex rel. Utilities Commission v. Public Staff*, 309 N.C. 195, 210, 306 S.E.2d 435, 444 (1983). The plain language of section 15A-544(h) provides no guidance as to whether "extraordinary cause" can exist where a defendant's death occurs after the date of appearance. However, what we do glean from section 15A-544(h) is that the statutory language does not prohibit remittance under those circumstances. It follows that the legislature did not, as the Board suggests, intend to limit remittance of forfeiture on a motion made after the

execution of judgment only to those cases where the surety can present a valid excuse for defendant's failure to appear. Rather, the use of the term "extraordinary cause" engenders a less rigid interpretation reflecting the compromise between the purpose of the forfeiture statute and the purpose of our bail bonds system in general. *Accord* Fed. R. Civ. P. 46(e)(1) (stating that forfeiture may be set aside if defendant is "subsequently surrendered . . . *or if it otherwise appears that justice does not require the forfeiture.*") *and* advisory committee's note to Rule 46(e) (noting that Rule 46(e) represents an effort to incorporate some flexibility).

The purpose of the forfeiture statutes is to establish "an orderly procedure for forfeiture [of bail bonds]," N.C. Gen. Stat. § 15A-544, official commentary; while the well-established purpose of bail bonds is to "secure the appearance of the principal in court as required." *Vikre*, 86 N.C. App. at 199, 356 S.E.2d at 804. *See generally Wiegand v. State*, 768 A.2d 43 (Md. 2001) (discussing extensively purpose behind forfeiture statutes). North Carolina's "orderly procedure for forfeiture," relies upon the continued cooperation of private and professional sureties. Sureties must be assured that if they expend money, time, and effort to recover criminal defendants, they have viable remedies for the return of forfeited bond money.

By the same token, the court system's paramount concern is ensuring the return of the criminal defendant for prosecution. *See Caro*, 753 P.2d at 201 ("the primary purpose of a bail bond is to assure that the defendant appears for trial"). We have accordingly deemed sureties the custodians of defendant and thus, "when the sureties entered into the conditions of the bail bonds on behalf of defendant . . . they became responsible for his appearance in . . . court." *Vikre*, 86 N.C. App. at 200, 356 S.E.2d at 805. To this end, we have also required, pursuant to our definition of "extraordinary cause," that sureties and their bondsmen diligently pursue defendants. The dual purpose inherent in our statutory scheme governing remittance suggests that where sureties diligently pursue defendants, who subsequently die through no fault of the surety, it would be unfair to the surety, whose function is to ensure the orderly procedure for the return of the defendants, not to then allow remittance.

Based upon the purpose behind section 15A-544(h), we conclude that "extraordinary cause" can exist where the defendant dies after the date of appearance and even, as in this case, after the execution of judgment of forfeiture. However, given the well-established and flexible definition of "extraordinary cause," it is our belief that "extra-

ordinary cause" does not exist based solely on the fact of defendants' death where it occurs after the date of appearance, and especially if it occurs after the execution of judgment. The fact of the defendant's death must be weighed against certain factors in determining whether a forfeited bond may be remitted for "extraordinary cause." In accordance with our jurisprudence in this area, these factors include the inconvenience and cost to the State and the courts, *see Jeffers v. United States*, 588 F.2d 425, 427 (1978); the diligence of sureties in staying abreast of the defendant's whereabouts prior to the date of appearance and in searching for the defendant prior to his death; the surety's diligence in obtaining information of the defendant's death and the risk assumed by the sureties, *see Vikre*, 86 N.C. App. 196, 356 S.E.2d 802; the surety's status, be it private or professional; and the timing of the defendant's death—whether it occurred after the date of appearance and prior to entry of judgment, after the entry of judgment and prior to execution, or, as in this case, after execution of judgment.

Our emphasis on a surety's diligence as a factor notwithstanding, we caution that diligence alone will not constitute "extraordinary cause," for due diligence by a surety is expected. *See State v. Shredeh*, 909 S.W.2d 833, 836 (Tenn. Ct. App. 1995) ("authority to relieve sureties from liability may only be exercised in extreme cases, such as the death of the defendant or some other condition making it impossible for sureties to surrender the defendant; the good faith effort made by the sureties or the amounts of their expense are not excuses"). Neither will the amount of expenses incurred by professional sureties due to a forfeiture constitute extraordinary cause. *See id.*

Furthermore, it was suggested at oral argument that because death is the ultimate justice, punishment, and capture, and because it ends the State's prosecution of defendants, death alone, at any time, constitutes "extraordinary cause." With this argument, we cannot agree. If death alone at any time after defendant's date of appearance were to constitute "extraordinary cause," it would give sureties no incentive to diligently pursue defendants. Presenting simply a death certificate, months, maybe years after execution of the judgment of forfeiture, sureties, who possibly expended little time and effort to search for defendants, could move for and receive remittance. *See cf. Western Surety Co.*, 208 P.2d at 1166 (citation omitted) (noting that although death after forfeiture may constitute a defense to forfeiture, " 'it seems that if a long period of time has elapsed after the forfeiture

STATE v. CORONEL

[145 N.C. App. 237 (2001)]

of the bond before the death of the principal occurs—as, for example, two years—the death does not constitute a defense to an action on the bond' "). Such a result runs contrary to the purpose behind the remittance statute.

Although we agree with sureties, that "extraordinary cause" can exist where death occurs after the execution of judgment of forfeiture, we conclude "extraordinary cause" did not exist in the present case. Based on the facts presented at the hearing, sureties' pursuit was simply not diligent. The key to this conclusion is a complete lack of evidence demonstrating that the sureties were concerned with defendants' 14 December appearance. They did not attend court on that date and acknowledged that they had no method of knowing whether defendants attended court. Moreover, they offered no explanation as to why defendants were not in attendance.

Furthermore, sureties subsequently located defendants in Mexico, apparently on trips that did not commence until July 1999. It appears that sureties could have detected defendants' whereabouts much earlier, given the information submitted to them by defendants, and their own sources indicating, possibly as early as April 1999, that defendants fled to Mexico. Sureties certainly assumed some risk, as defendants were Mexican farm workers, *see Vikre*, 86 N.C. App. at 198, 356 S.E.2d at 804, one of whom had only lived in the United States for one year and five months. Sureties were also aware that their power to capture defendants in Mexico was very limited, compared to their authority to do so in the United States. *See Taylor*, 83 U.S. 366, 21 L.Ed. 287. Given the facts presented by the present case, we conclude that the court did not abuse its discretion in concluding: "the cause of the defendant[s'] death[s] on August 11, 1999, does not constitute 'extraordinary cause' as a matter of law to warrant remittance of the bond judgment in whole or in part." Sureties' first argument is therefore overruled.

## II.

[2] Sureties next contend that the court erred in finding as fact: "[Sureties] made no efforts to locate [defendants] prior to July 4, 1999, as shown by [Thompson's expense report]." To support their argument, sureties offer Yerger's testimony that upon receiving notice that defendants did not appear in court, he ran a record check on defendants "to see if they show up . . . anywhere in [the] public record." Sureties further note that Yerger testified that he assigned the case to Agent Thompson and "later in April" assigned the case to

another recovery agent, only referred to as "Collins," who "at that point" discovered that defendants were in Mexico. With sureties' argument, we disagree.

Rule 52(a) of our Rules of Civil Procedure specifies: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specifically." N.C. Gen. Stat. § 1A-1, Rule 52(a) (1999). A trial court's factual findings are conclusive on appeal if supported by competent evidence. *Beightol v. Beightol*, 90 N.C. App. 58, 60, 367 S.E.2d 347, 348 (1988). As such, "[t]he trial court's findings have the force of a jury verdict if they are supported by competent evidence even though there may be evidence which would support findings to the contrary[.]" *Mann Contr'rs, Inc. v. Flair with Goldsmith Consultants-II, Inc.*, 135 N.C. App. 772, 775, 522 S.E.2d 118, 121 (1999).

The trial court, not the appellate court, weighs the credibility of evidence. *Kirkhart v. Saieed*, 98 N.C. App. 49, 54, 389 S.E.2d 837, 840 (1990). Therefore, "[w]here there is competent evidence in the record supporting the court's findings, we presume that the court relied upon it and disregarded the incompetent evidence." *In re Huff*, 140 N.C. App. 288, 301, 536 S.E.2d 838, 845 (2000) (citation omitted), *disc. review denied*, 353 N.C. 374, —— S.E. 2d. —— (2001).

Thompson's expense report revealed the sureties' expenditures in relation to the recovery of the two defendants did not begin until July 1999. Despite testimony indicating other possible trips to Mexico, there was absolutely no other evidence, such as agent's affidavits or other expense reports, to support sureties' contentions that they began their search prior to July 1999. Thompson's expense report, upon which the trial court presumably relied, therefore supports the court's finding that sureties made no efforts to locate defendants prior to 4 July 1999.

As for sureties' contention that Yerger's testimony supports a contrary finding, we point out the confusing and vague nature of that testimony, along with that of Black Jack employee, Regan. For instance, there was not a clear time line of events; there was no way to determine when the two trips Black Jack claimed to sponsor took place and whether they were in conjunction with the trips sponsored by Capital; there was no indication why defendants were under armed guards when Capital agents arrived in Mexico; and there were unexplained, vague references to several unnamed recovery agents. Therefore, we presume that the trial court weighed the expense

report against the above-referenced testimony, regarding the testimony as less credible. Because we find that competent evidence supported the court's challenged finding, sureties' second argument is also overruled.

## III.

**[3]** Finally, sureties argue that the trial court incorrectly found as fact that the judgment of forfeiture was entered on 8 April 1999. Sureties contend that the judgment was entered on 20 April 1999, the date it was filed, and that this error should be corrected as it affects the interest they will owe if the bond money is not remitted.

The trial court found in finding number four: "Judgment of bond forfeiture . . . *was entered* against defendant[s] and each surety . . . on April 8, 1999[.]" (Emphasis added.) An examination of the actual order shows that it was signed 8 April 1999 but filed on 20 April 1999. Rule 58 of our Rules of Civil Procedure provides: an order is entered when "reduced to writing, signed by the judge, and *filed with the clerk of court.*" N.C. Gen. Stat. § 1A-1, Rule 58 (1999) (emphasis added). Because the judgment of forfeiture was filed with the Clerk on 20 April 1999, this date represents the date the judgment was entered. Accordingly, the court was incorrect in finding that the judgment of forfeiture was entered on 8 April 1999. We, therefore, remand the case for the limited purpose of correcting finding of fact number four in both 1 November 1999 orders, thus allowing the record to speak the truth. *See* N.C.R. App. P. 9(b)(4); *State v. Dixon,* 139 N.C. App. 332, 533 S.E.2d 297 (2000).

In sum, we affirm the 1 November 1999 orders but remand the case in part for the limited purpose of correcting finding of fact number four consistent with this opinion.

Affirmed in part; remanded in part.

Judges WYNN and HUDSON concur.